# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### (Harrisonburg Division)

| | |
|---|---|
| In re: | ) |
| | ) |
| **ARTISAN PACKAGING, LLC**[1] | ) |
| | ) Case No. 23-50588 |
| | ) Chapter 11 |
| **Debtor.** | ) |
| | ) |
| | ) |

### DECLARATION OF RICHARD JAY VEENIS IN SUPPORT OF THE PETITION AND FIRST DAY MOTIONS

I, Richard Jay Veenis, hereby declare under penalty of perjury:

1. I am the sole member and Chief Executive Officer ("CEO") of Artisan Packaging LLC, a limited liability company organized under the laws of the Commonwealth of Virginia and the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned case (the "Bankruptcy Case") under Subchapter V of Chapter 11, Title 11 of the United States Code (11 U.S.C. §§ 101-1532, the "Bankruptcy Code"). I am generally familiar with the day-to-day operations, business, and financial affairs and books and records of the Debtor.

2. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") in the United States Bankruptcy Court for the Western District of Virginia, Harrisonburg Division (this "Court") for relief under Subchapter V, Chapter 11 of the Bankruptcy Code as well as the two First Day Motions (as defined herein).

3. I submit this Declaration in support of the Petition and the First Day Motions. The relief requested in each of the First Day Motions is necessary to maximize the value of the Debtor's

---

[1] The Debtor's principal office address is 291 W. Wolfe Street, Harrisonburg, Virginia 22801 and last four digits of its tax identification number are 2655.

1

estate and allow for the "in place" sale, sale or liquidation through other vehicles of the Debtor's assets.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by members of the Debtor's management team, other employees of the Debtor, or the Debtor's professional advisors; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities, and financials. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

I. **Background of the Debtor's Business and Financial Conditions**

5. While it was in operation, the Debtor manufactured high-end decorated plastic bottles. The bottles were blow molded, and then decorated by silk screening, hot stamping, pressure sensitive labeling, and/or shrink sleeves. The Debtor's primary market was in personal care (65%), with food (20%) and healthcare products (15%) completing the Debtor's market space.

6. The Debtor operated out of a 200,000 square foot facility located in Harrisonburg, Virginia (the "Facility"), which it leases from its affiliate, Veenis & Associates LLC ("VAL") of which I am the sole member. The Facility was serviced by a railroad spur used to fill the five (5) storage silos, each capable of holding approximately 280,000 pounds of resin needed for plastic production.

7. To support its regular business operations and prior to the Petition Date, the Debtor acquired hundreds of pieces of manufacturing equipment and related tooling and molds, the vast majority of which are housed in the Facility.

## II. Circumstances Giving Rise to this Bankruptcy Case

8. The Debtor was formed in 2019 with the first year revenue of $13 million, which increased annually in 2020 and 2021, and topping out at approximately $19 million in 2022.

9. The Debtor expected and anticipated this growth to continue into 2023. However, in early 2023, the Debtor's revenue reduced significantly, as market forces, including oversupply of bottles which customers accumulated during the COVID-19 years, had not yet worked their way through their distribution chains.

10. In response to its declining revenue, the Debtor took steps to minimize operating costs, including reducing its workforce, cutting variable expenses, and renegotiating prices with its suppliers.

11. Despite these efforts, the adverse market conditions persisted and ultimately required the Debtor to cease altogether its manufacturing and decorating activities in October 2023 and further substantially reduce its workforce.

12. Thereafter, and through and, including the Petition Date, the Debtor, through its current thirteen employees of which I am one (the "Remaining Employees"), continue to collect accounts receivable, continue to pack and ship its inventory of bottles as its remaining customers place orders and inspect and maintain its equipment to optimize its sale potential.

## III. Capital and Debt Structure

13. The Debtor is a limited liability company, and I own 100% of its membership interests.

### A. Secured Debt

14. As for secured debt, the following entities have filed UCC-1 financing statements against the Debtor which have not expired or terminated:

   a. F&M Bank;

      b. CloudFund LLC;

      c. Cedar Advance LLC;

      d. Dimensional Funding LLC; and

      e. De Lange Landen Financial Services, Inc.

**F&M**

15. In August 2021 and September 2021, the Debtor entered into those certain loan agreements with and borrowed money from Farmers and Merchants Bank ("F&M"). As of the Petition Date, the aggregate outstanding balance owed to F&M was approximately $3.6 million (the "F&M Debt").

16. F&M asserts a blanket security interest in all of the Debtor's assets, including its accounts receivable and cash deposits, as collateral for the F&M debt. F&M filed its UCC-1 financing statement in September, 2020 which attached to after acquired assets of the Debtor. In addition, F&M has a guarantee of the F&M Debt from VAL, which is secured by a deed of trust on the Facility.

17. The Debtor believes that F&M holds the first and best lien against the Debtor's personal property, including "Cash Collateral" as that term is defined in §363 of the Bankruptcy Code.

**CloudFund and Cedar**

18. Prior to the Petition Date and in or about July 2023, two entities, CloudFund, LLC ("CloudFund") and Cedar Advance LLC ("Cedar" and with CloudFund, the "MCA Lenders") each provided funds to the Debtor through purported "merchant cash advances", whereby funds are provided, based on a volume or percentage of anticipated accounts receivable, rather than assigning (or factoring) actual accounts receivable.

4

19. In or about November 2023 and within 90 days prior to the Petition Date, CloudFund and Cedar each filed a UCC-1 financing statements purporting to assert a security interest in "all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the 'UCC'), now or hereafter owned or acquired by Seller; and all Seller's proceeds, as such term is defined by Article 9 of the UCC" and "receivables and proceeds", respectively.

20. The Debtor does not concede that the MCA Lenders hold valid and/or perfected liens against any of the Debtor's property including Cash Collateral. The Debtor reserves all rights, challenges and objections to any claims or liens the MCA Lenders may assert.

**Dimension and De Lange**

21. Also prior to the Petition Date two other entities, namely, Dimension Funding, LLC ("Dimension") and DeLage Landen Financial Services, Inc. ("DeLage") provided the Debtor with funds for the financing of certain equipment items. Dimension and DeLage each filed UCC1 financing statements which limited the collateral to the respective equipment each financed, which equipment remains in the Debtor's possession.

22. The Debtor does not concede that Dimension or DeLage hold a valid and perfected lien against any of the Debtor's assets, and reserves all rights, challenges, and objections to any claims or liens they may assert.

**Unsecured Debt**

23. As for unsecured debt, as of the Petition Date the Debtor owed approximately $1.5 million to various vendors, suppliers, and other creditors with respect to products and services that the Debtor purchased in the normal course of its operations.

**IV.    Objectives in the Bankruptcy Case**

24.    Through these bankruptcy proceedings, the Debtor intends to sell its assets either through an "in place" sale without removal from the facility and/or through other sales or liquidation vehicles. Prior to the Petition Date, and continuing through the date of this Declaration, I and other Remaining Employees of the Debtor, have and continue to solicit interest in such sales.

**V.    Summary of First Day Motions**

25.    Concurrently with the filing of its Chapter 11 petition, the Debtor has filed two "first day motions "(the "First Day Motions"), seeking relief that the Debtor believes is necessary to enable it to continue its reduced operations during the Chapter 11 process with minimal disruption and loss of productivity, while also preserving value for all interested parties. The First Day Motions include: (I) "Motion for Order Granting: (A) Interim Authority to Use Cash Collateral, (B) Request for Expedited Hearing; and (C) Related Relief" (the "Cash Collateral Motion") and (II) "Motion for Entry of Order (A) Authorizing Debtor to Pay Prepetition Employee Wages, Benefits, and Other Compensation; (B) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition; (C) Authorizing and Directing Banks and Other Financial Institutions to Honor All Checks Presented and Electronic Fund Transfer Requests Related to the Foregoing; (D) Granting Request for Expedited Hearing; and (E) Related Relief" (the "Prepetition Wage Motion").

26.    I have reviewed each of the First Day Motions which are discussed more fully below, and the facts set forth therein are true and correct to the best of my knowledge and belief based upon:(a) my personal knowledge of the Debtor's operations and finances; (b) information learned from my review of relevant business records and other documents of the Debtor; (c) information supplied to me by other of the Debtor's remaining employees and the Debtor's

advisors, and/or (d) my own personal opinions, based on my 39 years of experience in the plastic manufacturing industry.

### A. The Cash Collateral Motion

27. In the Cash Collateral Motion, the Debtor seeks authorization on an interim and final basis to use Cash Collateral (as defined below) and to grant adequate protection to F&M. Attached to the Cash Collateral Motion as Exhibit F is a forecasted thirteen (13) week budget (the "Budget") for revenue expected to be generated and payment of costs and expenses expected to be incurred in the ordinary course of the Debtor's operations during that time frame. I have reviewed the Cash Collateral Motion and in particular the Budget and believe them to be an accurate portrayal of the facts and circumstances set forth therein.

28. Continued use of Cash Collateral affords the Debtor the opportunity to prosecute these Chapter 11 proceedings, and realize maximum value for the assets of the estate. Payment of the expense items reflected in the Cash Collateral Motion, which includes post-petition payroll, security, utilities and insurance, are absolutely essential to protect and market the Debtors' assets, and affect an orderly wind-down of the Debtor's operations.

29. Absent this relief, the Debtor is faced with severe disruption in its post-petition operations, resulting in irreparable damage to its relationship with the Remaining Employees who would suffer significant personal financial harm as well its critical vendors whose cooperation through the wind-down process is essential.

30. The Debtor understands that F&M consents to the use of its Cash Collateral on the terms set forth in the Cash Collateral Motion, which I believe are the best available and provide a great benefit to the Debtor's estate.

### B. The Prepetition Wage Motion

31. In the Prepetition Wage Motion, the Debtor is requesting entry of an order, inter alia, on an expedited basis: (a) authorizing, but not directing, the Debtor to pay accrued, pre-petition wages, salaries, and other compensation to its thirteen Remaining Employees (including me); (b) authorizing, but not directing, the Debtor to reimburse employees for expenses incurred pre-petition on behalf of the Debtor; (c) authorizing and directing banks and any other financial institutions to receive, process, honor and pay all checks presented for payment and electronic fund transfer requests related to the foregoing; and (d) granting such relief on an expedited basis.

32. As of the Petition Date, the Debtor employed the thirteen (13) Remaining Employees, twelve (12) of whom work full-time, with eleven (11) of these employees paid a salary. Of the other two Remaining Employees, one is full time and one is part time, both paid on an hourly basis.

33. Each of the Remaining Employees perform a variety of critical functions, including collecting accounts receivable, packaging and shipping the Debtor's remaining inventory as ordered by customers, and testing and maintaining the Debtor's equipment to preserve their condition and maximize their salability. The functions of each Employee's role is more specifically outlined in Exhibit C of the Prepetition Wage Motion.

34. In the ordinary course of business, the Debtor incurs payroll obligations for salaries and hourly wages owed to its employees. Salaries and hourly wages for the Remaining Employees are paid weekly.

35. As of the Petition Date, the Debtor estimates that it owes $41,472.74 to its Employees for prepetition Employee wage obligations. The Debtor seeks the authority to pay and honor its Prepetition Wage Obligations.

36. As of the date of this Affidavit, all the Remaining Employees set forth on the Employee List are employed by Debtor.

37. The only Employee that is an insider—myself, Richard Jay Veenis—is clearly set forth as such on the Employee List.

38. The payroll and employee procedures sought to be continued are the same as those employed by the Debtor prior to the Petition Date in the ordinary course of its business.

39. The payment of balances owed on prepetition payroll are necessary to fairly compensate the Remaining Employees for the reasonable value of services performed in the ordinary course of employment and consistent with payment terms in Debtor's historic ordinary course.

40. The retention of the Remaining Employees is absolutely essential to the successful sale of the Debtor's assets, whether in place or otherwise. These employees are needed to continue to collect outstanding accounts receivable to fund the cash needs of the Debtor during these proceedings, as well as package and ship the remaining inventory to fully monetize its value and importantly, provide preventative maintenance of the equipment and to position it in the best means possible for sale. Certain of these employees will be instrumental in providing information to prospective buyers and information and coordination of the logistics necessary to affect the shipment of sold equipment.

41. I believe that loss of any of the Remaining Employees at this juncture will have a detrimental effect on the goals for which these bankruptcy proceedings were commenced. Each play a vital role in the wind-down process and finding replacements in this economy, and under these circumstances, would in my opinion, be extremely difficult, if not impossible. Any disruption

in their earned and anticipated pre-petition benefits would cause serious damage to the Debtor's relationship with them, and impose upon these employees significant financial hardship.

42. Accordingly, for the reasons set forth herein, and those set forth in the Prepetition Wage Motion, I, on behalf of the Debtor, respectfully submit that the relief requested in the Prepetition Wage Motion is in the best interest of the estate, the creditors and all the parties and interest in these proceedings.

## VI. Conclusion

43. The Debtor's ultimate goal in this Bankruptcy Case is to consummate a value-maximizing transaction for the benefit of all of its creditors.

44. In order to achieve this goal, the Debtor must minimize any loss of value of its business or assets during the pendency of this Bankruptcy Case, including during the critical first few weeks following the Petition Date.

45. I have reviewed each of the First Day Motions, and the facts therein are true and correct to the best of my knowledge, information, and belief.

46. I believe that the relief sought in each of the First Day Motions is vital to enable the Debtor to make the transition to, and operate in, Chapter 11 with minimum interruption or disruption to its business or loss of going concern value and constitutes a critical element in the Debtor achieving its objectives in this Bankruptcy Case. I further believe the requested relief is in the best interest of the Debtor's estate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 11, 2023

_Richard J. Veenis_
Richard J. Veenis, Sole Member and
Chief Executive Officer

23023419-4